


FILED
FEB 15 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

UNDER SEAL

Matthew D. Carlson (State Bar No. 273242)
mdcarlson@mdcarlsonlaw.com
LAW OFFICE OF MATTHEW D. CARLSON
50 Fountain Plaza, Suite 1400, #206
Buffalo, NY 14202
Telephone: (716) 242-1234

Attorney for Relator SARAH STONEHOCKER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA



CV 19 873

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SARAH STONEHOCKER, <br><br> Plaintiff and Relator, <br><br> v. <br><br> KINDRED HEALTHCARE, INC., KINDRED HEALTHCARE OPERATING, LLC, and DOES 1-50, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |




COMPLAINT

The United States of America, by and through Relator Sarah Stonehocker, brings this False Claims Act action against Defendants Kindred HealthCare, Inc., Kindred HealthCare Operating, LLC (collectively, "Kindred"), and Does 1-50, and hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action by Relator, on behalf of the United States of America, to recover damages and civil penalties arising from (1) Kindred's practice of willfully submitting false claims to Medicare for services purportedly performed at Kindred's Skilled Nursing Facilities ("SNFs") that, in fact, did not occur, and (2) Kindred's practice of willfully submitting false claims to Medicare for services performed at SNFs that were not medically necessary.

2. This action follows the False Claims Act action *U.S. ex rel. Halpin et al., v. Kindred Health Care Inc., et al.*, No. 1:11-cv-12139-RGS (D. Mass), in which the United States intervened, and which ultimately resulted in a settlement and release of claims, including claims under the False Claims Act, extending through September 30, 2013.

3. The thrust of the original *Halpin* complaint (which the United States subsequently expanded when it intervened) was that Kindred employed several practices which resulted in Kindred billing Medicare for medically unnecessary services. Specifically, the *Halpin* action arose, in part, from Kindred's practice of imposing strict and impracticable productivity standards on its clinicians which resulted in inaccurate and inflated billing, as well as Kindred's practice of "trolling for patients" for whom services subject to Medicare Part B reimbursement were provided even if not medically necessary.

4. The thrust of this action is that even after September 30, 2013, Kindred continued to impose strict and impracticable productivity standards on its employees, specifically Skilled Clinicians ("SCs") (including physical therapists, occupational therapists, and speech therapists) at its SNFs, which led to continued inaccurate and inflated billing. Moreover, even after September 30, 2013, Kindred continued to pressure SCs into providing medically unnecessary services purportedly subject to reimbursement pursuant to Medicare Part B. These practices were in place at least until Kindred completed the sale of its SNFs in or around the end of 2017.

## JURISDICTION

5. This Court has jurisdiction over this matter pursuant to 31 U.S.C. § 3732.

## VENUE

6. This Court is the proper venue for this matter because Kindred transacts business in this judicial district, and because Relator worked for Kindred in this judicial district.

## THE PARTIES

7. Relator Sarah Stonehocker is a citizen of California, domiciled in San Francisco, California. Relator worked for Kindred as a SC (in Relator's case, an occupational therapist) in several of Kindred's San Francisco SNFs (Tunnell Center and, from time to time, Lawton and Victorian Centers) from October 31, 2006, until October 10, 2016, at which time she transitioned to a home health care position with Kindred. Relator's employment relationship with Kindred ended on December 28, 2019. For a one-month period around July 2015, Relator worked as a temporary first-level Rehabilitation Manager ("RM"), filling in for Relator's RM and direct superior, during which time Relator worked as both an SC and as a RM/first level manager of her SC colleagues.

8. Relator is the original source of the information set forth herein, as, to Relator's knowledge, Kindred's violations of the False Claims Act as described herein have not been publicly disclosed. Relator voluntarily provided the U.S. government with the information set forth in this Complaint and other relevant information and documents before filing this action.

9. Kindred HealthCare, Inc., is a Delaware limited liability company with its principal place of business in Louisville, Kentucky, and is a parent company of Kindred HealthCare Operating, LLC.

10. Kindred HealthCare Operating, LLC, is a Delaware limited liability company with its principal place of business in Louisville, Kentucky, doing business throughout California during the relevant time period as a provider of, *inter alia*, SNF facilities and patient care.

//

COMPLAINT
2

11. Relator does not know the names or capacities of Does 1-50, but discovery may show that subsidiaries, affiliates, parent companies, purchasers, and/or joint venturers of or with Kindred and/or its interests may properly be Defendants in this matter.

## FACTUAL ALLEGATIONS

12. Kindred SCs, or skilled clinicians, were typically required to see seven to twelve patients during their eight-hour shifts at Kindred's SNFs. With respect to each "regular" patient visit (*i.e.*, visits that were not for initial evaluations, reassessments, or discharge), SCs provided skilled direct patient care, and also performed a minimum of approximately 10-20 minutes per patient of unskilled ancillary work, including, for example, paperwork, chart review, and care team communication. SCs also spent 15-30 minutes each shift checking in at the beginning of their shifts, obtaining their schedules, and checking out at the end of their shifts. SCs were also typically provided with two ten-minute rest breaks each day. Thus, during each eight-hour shift, SCs spent, at minimum, 105 minutes of their 420-minute shifts – 25% of their time – on unskilled work for which Medicare does not provide reimbursement: basic ancillary work, breaks, and shift prep and wrap-up tasks. SCs frequently spent substantially more than 25% of their shift on unskilled work when they saw patients for initial evaluations, reassessments, and discharge. SCs also attended weekly or biweekly staff meetings that each took between 30 minutes and one hour, which further reduced the amount of skilled work provided on the days on which staff meetings were held.

13. Despite this allocation of work time, Kindred maintained a minimum Patient Care Ratio ("minimum PCR"), pursuant to which SCs were required to spend at least 87% of their shift time on skilled direct patient care.

14. Kindred and its management rigorously enforced the minimum PCR. For example, Kindred Area Directors (second-level managers including, for example, Johny Lee, Krishna Velaga, and Steve Christensen) sent to subordinate RMs (first-level managers including, for example, Ben Miller, Bridget McAllister, Megan Weathers, Carlo Luna, Ronald Moore, Heta Sheth, Alicja Janiczek, Karen Wilhoite, Sandra Wiegand, Naseem Syed, Aashak Raval, and, for

an approximately one-month period, Relator) spreadsheets containing, *inter alia*, individual SCs' PCRs, with instructions to "get our therapists up to expectations", "ameliorate the low time spent in direct pt care", and to "concentrate on the outliers highlighted" in the spreadsheets. Indeed, SCs with PCRs below 87% had their names and statistics highlighted in yellow on such spreadsheets. Thus, SCs who fell below the minimum PCR were reprimanded by RMs and were forced to meet with RMs to discuss why they did not meet the minimum PCR and to come up with a plan to meet or exceed the minimum PCR, and RMs frequently posted SCs' PCRs on viewable bulletin boards. Kindred also implemented a generally applicable policy pursuant to which it paid bonuses to SCs who maintained PCRs at 87% or higher (87%-89% = 1.5% bonus; 90%-92% = 2.0% bonus; 93%-100% = 2.5% bonus). SCs were therefore incentivized and pressured to meet or exceed their minimum PCRs or face adverse employment action, lesser pay, or both. RMs were, in turn, pressured by Area Directors (and likely also incentivized) to have SCs under their management meet or exceed the minimum PCR, and Area Directors reprimanded RMs when SCs failed to meet or exceed the minimum PCR.

15.     Even though it was impracticable for SCs to meet the minimum PCR, documents in Relator's possession show that many SCs reported meeting or exceeding the minimum PCR. SCs were able to do so because managers pressured SCs into inflating the percentage of their work time spent on skilled direct patient care and, correspondingly, deflating time spent on unskilled work activities. Managers sometimes gave specific instructions on how to inflate PCRs; for example, requiring SCs to fill out paperwork with a patient present (referred to by managers as "point of care documentation") so that such time could, according to Kindred, count as skilled hours worked. Other times, managers required SCs to perform group treatment, even when to do so was clinically inappropriate. SCs also regularly worked unpaid and undocumented overtime hours performing unskilled work in order to achieve a higher PCR (though in such instances SCs still frequently found themselves needing to inflate their PCRs in an attempt to meet the minimum).

16. Thus, Kindred and its management, who were familiar with SCs work responsibilities and schedules, knew it was impracticable for SCs to legitimately meet or exceed the minimum PCR.

17. The reason Kindred and its managers pressured SCs into inflating PCRs was to maximize the skilled work time for which Kindred could bill and be reimbursed by Medicare, as Kindred was not permitted under Medicare to bill for SC's unskilled work time. Thus, Kindred had an incentive to pressure SCs into inflating PCRs, and Kindred exerted this pressure with the intent to obtain more reimbursement from Medicare than was actually owed by the U.S. government.

18. In addition to submitting claims for reimbursement based on inflated PCRs, Kindred utilized another method by which it improperly billed Medicare: when patients at Kindred's SNFs exhausted their Medicare Part A benefits, SCs were pressured into recruiting those patients to receive services covered by Medicare Part B, even though such services were not medically necessary.  For example, Area Directors distributed to RMs a "handout[] for target clinical extenders" [sic]; Area Directors and RMs distributed fliers outlining ways to increase the number of patients receiving services covered by Medicare Part B and/or the frequency of such services; and Area Directors distributed a document instructing RMs that "[i]f Part B utilization is low, consider having a therapist from another facility come in" who might be more inclined to advocate for medically unnecessary Medicare Part B-covered services on patients. Further, Area Directors maintained detailed statistics concerning the number of Kindred patients receiving services subject to Medicare Part B, and Area Directors used these statistics daily to pressure RMs into pressuring SCs into providing medically unnecessary services subject to Medicare Part B to patients.

19. The illegal practices identified herein were not limited to the SNFs at which Relator worked. Emails in Relator's possession concerning enforcement of the minimum PCR and unnecessarily providing services subject to Medicare Part B were amongst RMs in and/or overseeing multiple California SNFs, and the policies and practices Relator experienced and as

described herein are consistent with some of the policies and practices set forth in the *Halpin* action, which was venued in Massachusetts. For these reasons, Relator believes the policies and practice discussed herein are applicable nationwide.

## CLAIM 1: VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. §§ 3729–3733

20. Relator incorporates all preceding allegations as if fully set forth herein.

21. As discussed herein, Kindred directly or indirectly submitted to the U.S. government claims for reimbursement for skilled work that was not actually provided by SCs. As also discussed herein, Kindred also directly or indirectly submitted to the U.S. government claims for reimbursement for services subject to Medicare Part B even though such services were not medically necessary.

22. As discussed herein, Kindred's submission of false claims for reimbursement were knowing and intentional, as Kindred knew it was impracticable for SCs to legitimately meet or exceed the minimum PCR, but nonetheless Kindred requested and received reimbursement from the U.S. government reflecting work by SCs at or above the minimum PCR. As also discussed herein, Kindred knew SCs were providing Kindred patients with medically unnecessary services subject to Medicare Part B and in fact encouraged it, but nonetheless Kindred requested and received reimbursement from the U.S. government for such services.

23. As discussed herein, certain amounts of reimbursement requested by Kindred from the U.S. government and received by Kindred from the U.S. government were based on inflated and incorrect PCRs, reflecting inflated and incorrect amounts of time SCs spent performing skilled work. As also discussed herein, certain amounts of reimbursement requested by Kindred from the U.S. government and received by Kindred from the U.S. government were based on medically unnecessary services provided to patients.

24. Had the U.S. government known that certain amounts of reimbursement requested by Kindred from the U.S. government and received by Kindred from the U.S. government were based on inflated and incorrect PCRs, reflecting inflated and incorrect amounts of time SCs

spent performing skilled work, the U.S. government would not have paid such amounts in whole or in part. Similarly, had the U.S. government known that certain amounts of reimbursement requested by Kindred from the U.S. government and received by Kindred from the U.S. government arose from the provision of medically unnecessary services, the U.S. government would not have paid such amounts.

## PRAYER FOR RELIEF

Relator hereby requests relief as follows:

a. Damages in the amount of three times the damages sustained by the United States because of Defendants' violations of the False Claims Act;

b. Civil penalties for each false claim Defendants presented or caused to be presented to the United States;

c. Pre and post-judgment interest;

d. Attorneys' fees;

e. Costs of suit;

f. An appropriate award to Relator; and

g. Any other relief the Court deems proper.

## DEMAND FOR TRIAL BY JURY

Relator, on behalf of herself and the United States, hereby respectfully demands a trial by jury in this matter.

Dated: February 15, 2019

LAW OFFICE OF MATTHEW D. CARLSON

By: /s/ Matthew D. Carlson
Matthew D. Carlson
Attorney for Relator